We'll hear the next case on the calendar, Williams. Just wait a second, please. Please proceed. Thank you, Your Honor. May it please the Court, my name is Matt Lasher and I represent the United States as the appellant in this case. It's obviously a somewhat unusual position for the government to be in, but so is holding arguments before the hundred plus judges who are behind me in addition to the three on the panel. I'm proud to be here. This is my first argument before the Second Circuit, and before I start, I would like to address one preliminary matter. Welcome to the Second Circuit. One minor correction that I believe is not pertinent to the issues, but nonetheless may be of interest in the case, is that while this appeal has been pending, the defendant Applee has been released on conditions of supervision. At the time we began the briefing, he was still detained. While it's not always easily answered, I think the question before the appellate court hears easily stated, and that's whether the agents who are pursuing Andrew Williams on May 17th, 2018, had probable cause to arrest him and probable cause to search his vehicle. The facts in this case are primarily undisputed, so the court has before it the totality that it needs to make that probable cause determination. I believe that the district court erred in three primary ways in this case. First, it did not analyze the totality of the circumstances, in that it took up some of the circumstances in isolation and analyzed them in that sense, and then it excluded some of the relevant considerations from that totality. How else are you supposed to challenge the totality of the circumstances if not taking it piece by piece and explaining why they are not sufficient? Each one of those circumstances should be analyzed both in and of itself and in the context of the other circumstances. For example, a moment of flight, while ambiguous under certain circumstances, begins to take some form when you couple it with the attendant circumstances around it, that he turned around in the vehicle quickly to see if he was being followed and then fled immediately after that surveillance detection technique and coming nose to nose with the agents who were attempting to stop him. I would have thought that your argument might have been that your concern is that the district court didn't consider additional facts that it could have that might have led to a different result, like the street address where Mr. Williams was observed and the fact that there were Pennsylvania license plates on his car. Yes, Your Honor. I believe that's the second way in which the district court did not analyze the totality of the circumstances. It simply excluded some of the key factors, and Your Honor has pointed to two that we believe are the most significant. At the moment when the individual matching the description, a description provided by two different sources of information, emerged from the specific address and got into a vehicle that was Pennsylvania plated, at that moment the officers who were pursuing had far more information than they had said. And their information was that this gentleman was from Pennsylvania? That's correct, Your Honor. Both individuals. And the car plates are from Pennsylvania? Yes, Your Honor. And the individual agents who were pursuing this case would be well aware, as mentioned in the testimony, that Pennsylvania is a source state and specifically Philadelphia is a source city for drugs that are coming into the Burlington metro area and Winooski specifically. Do we have any empirical sense of how often one could expect to see a Pennsylvania plate in a licensed plate in Vermont? I don't believe the record reflects that, Your Honor, although with the University of Vermont present in the city, there would be out-of-state plates present, but that particular area of Winooski would be slightly less prevalent in that sense. But certainly when you have someone matching a description that's been given to you come out and get in that car, it has tremendous significance to the case. Because if, you know, you could imagine a scenario where it's a New York place, it takes place, the drug deal takes place in New York, but the licensed plate, as identified, was New Jersey. Well, there are lots of New Jersey licensed plates that come into New York. I think, I'm sorry, Your Honor. So that would be a slightly, that would be a different situation perhaps than here, than in Vermont, but it really depends on, to some extent, on the prevalence of Pennsylvania licensed plates in Vermont. I agree wholeheartedly, Your Honor, and that's simply not as common of occurrence and the agents who are pursuing, or at least on surveillance at that point, prior to their pursuit, would be well aware of that. Is that in the record? I mean, you and I know it's a university town, St. Michael's, UVM, other schools, but was the, did somebody testify that it was the Pennsylvania plate that tipped them off? Yes, Your Honor, as Agent Pinkham testified, he knew that he was looking for an individual who was from Philadelphia, and that's when they stepped into the vehicle. And so had it been a Vermont plate, would it have been a bad bust? Had it been a Vermont plate, I think they would have needed additional information in order to corroborate the sources, but indeed, in this circumstance, this brings me to another way in which the district court erred, that it did not give credit to both the sources of information and to the agents and their training and experience, specifically their And when you have two independent sources of information who provide overlapping and consistent details like they did here, and then that is corroborated by the agent's observations, at the point at which he steps into that vehicle, probable cause likely existed. So totality of the circumstances means that if you have one vague description that's corroborated by another vague description, but the two vague descriptions are the same, that can give you probable cause? I don't believe that's quite the formula, Your Honor, but what I would suggest is that when a first source of information provides a description and predictive information, that predictive information is corroborated by agent observations. When the second source of information, who is a participant in the crime at issue, surrenders controlled substances to the agents, provides a detailed description of how it happened, where it happened, the cellular phone that was used, the number of times she's interacted with them, and that description comports with the first source's description, then what was described as vague or general becomes far more specific. When you link that with the Philadelphia plate and the surveillance detection technique and the flight from the vehicle, all of those things certainly add up to probable cause. On the flight, can you explain whose perspective we're supposed to look at that from? I think the district court said that Williams had no reason to believe that he was fleeing law enforcement, but isn't it the perspective of the officer, a reasonable officer, rather than whether Williams actually understood that non-uniformed and unmarked cars were law enforcement? Yes, Your Honor, and I would like to parse that just a bit before responding in full. First of all, I think the district court decided that there was no evidence in the record that the defendant knew he was fleeing from the police, and that's different from saying the defendant did not know he was fleeing from police. Because his headlong flight was so successful, there was no evidence that he outwardly presented to show that he knew he was running from the police, but more importantly, the second factor is that we should be looking at it from the agent's perspective and what that was signifying to them, and certainly they knew at that moment that he had executed a surveillance detection technique, matched the descriptions, and therefore it was significant to them. Let me, before you sit down, if I could ask you this. Let's say that, you know, arguendo, that we were to agree with you on the probable cause question, would it be sensible for us to remand so that the district court can reconsider the search of the car without the assumptions that the district court had made about probable cause? Your Honor, I don't think a remand would be necessary. I think the record fully establishes the circumstances that would be necessary to make the independent determination that probable cause existed for that search. I hate kind of the converse of that question, which is if we decided that the arrest was made without probable cause, what happens to the auto search? I believe there could be an independent determination that probable cause did exist for that vehicle. The standards for probable cause between an arrest and a search are not exactly the same, and there is some movement in between, but I think that would be an independent determination the court could make. Why not leave it to the district court in the first instance to look into that? Your Honor, again, because I believe that the circumstances in the record are sufficient for the court to make that decision. Thank you. Good morning, Your Honor, if it may please the court. The government does not argue in its brief, nor here today, that any of the factual findings found by the district court were in error, let alone clearly erroneous. The trial court was correct in completely discounting the information from the original source of information when making her probable cause determination. The government introduced no evidence about this original source of information. In fact, at the suppression hearing, the government asked two questions of the officers regarding the source of information. Were you familiar with the source, and had you previously worked with that source? That's it. That's at the joint appendix at 21. There is no information, not just about who the source was, the reliability of the source, the traditional things we would want to know about the source. It doesn't have any information about where the source got this information. So the government argues, and correct me if I'm misunderstanding the government's argument, that the totality of the circumstances included the arresting agent receiving information that Mr. Gurin had brought drugs from a person from Pennsylvania at 111 Weaver Street, and that the same agent observing Mr. Williams, leaving that address, and then driving away in a car with Pennsylvania license plates. Is that incorrect? Am I misstating? That's the government's argument, and you're saying that's not to be found in the record. Is that what you're saying? No, the government's argument, I believe, is that there were two sources of information that kind of corroborate themselves. There's one source of information saying Ms. Gurin is going to go to Weaver Street in Winooski and get drugs from a well-dressed black man wearing glasses from Pennsylvania, and then, lo and behold, Ms. Gurin does exactly that, goes to Winooski. The point I'm making, Your Honor, is that that original source of information may not have had independent information. There's nothing in the record to suggest that this person, this original source of information, had actually witnessed some sort of drug transaction or had any firsthand knowledge of who the individual was that was supposedly the drug dealer in Winooski. It struck me that that would have been critical if Ms. Gurin was our defendant, and the question was about the probable cause to arrest her, but she wasn't charged. So doesn't the fact that what happened is exactly what the original SOI said would happen, confirmed and validated by her account? I think what the government is arguing, and perhaps I'm wrong, is that the fact is that there's two people who have seen this drug dealer in Winooski, and one is saying this and the other, and that's not in the record at all. The original source may have heard the information from somebody else, including Ms. Gurin, so it may be that there aren't two different sources of information that are somehow both predictive. One's predictive and then one is from Ms. Gurin. That's not in the record at all. We don't know who the original source was, and we don't know where the information came from that the source is now telling the police officers. In fact, the original information is that this source of information is going to meet with Ms. Gurin, and moments later the police go to a place in Burlington and they find her with Ms. Gurin. So it may be that this original source of information had never been to Winooski, had never seen anybody there, and isn't providing any independent information at all. A cornerstone of the government's argument is that we have two, albeit vague, descriptions, but that somehow two really vague descriptions by two independent folks somehow boost it up. Well, I think the government's argument is it's not just that you've got a vague description. Well, I guess first of all, let's take the vagueness. I can understand how the description might be vague in Washington Square Park, but what about at 111 Weaver Street in Winooski? It seems like if you've got two people describing the same type of person, clothes, glasses, that becomes a lot more specific. And again, I don't think the record supports it's two people, but again, in the record, Winooski is the most ethnically diverse place in Vermont. It's got a large refugee population. It is the home of or near the home of four different universities, as Judge Crawford pointed out, and so I don't think we're talking about being in Guildhall, Vermont, or somewhere where there are at times no ethnic diversity. But didn't they have actually a specific street address? They did. They did, Weaver Street in Winooski. That was the address that was provided. And so, again, talking about the vague description, I think that the description is, as far as a physical description is concerned, it's not just vague. It's not in any way significant to any particular individual. And then the only things that are added in there are that the person is well-dressed and from Pennsylvania, that have something more. And, again, the things that are lacking from that description, I think, are instructive. And this is coming from, and again, it may be a single source of information, and there's nothing in that description that is any more descriptive. Things you would expect, and this is in the record because I asked the agents at the suppression hearing, did you ask about complexion, light or dark? Did you ask about height? Did you ask about weight? Was anything provided with regard to hairstyle? Well-dressed. How was the well-dressed? Was the person wearing a tie? Were they wearing a suit? And the officers all said no. This is all at the joint appendix at 48. That there's not just a vague description, there's the lack of detail that one might expect, especially from Ms. Guerin, who supposedly – that in the context of adding it to the Pennsylvania plates and a specific street address, those things, which might be vague in other contexts, actually become quite helpful and specific. I think the court made findings on those issues, and they were not significant to the court. The court went through its decision and, I think, found those things. Some of those things occurred, but they weren't significant in her decision, and I think she clearly states the accurate standard, and the government doesn't quibble with that. They just don't like the result that they got here. The things that – some of the things that the government points to are so minor, I think it's fair that the court did not include them in its findings. For example, the technique, the lack of detection technique that supposedly Mr. Williams engaged in, he essentially – and this was brought out through the testimony at the hearing – he essentially pulls into a parking lot, goes to the back of the parking lot, and turns around and starts coming out. This is not a pattern that the courts have suggested, a pattern that you could look to and find that there is a significance to that. This is the government pointing to isolated events, trying to build a totality of the circumstances, and I think the totality is built on bricks, and if all the bricks are faulty, then you don't have the totality of the circumstances. We could probably agree that it wouldn't be correct – there wouldn't be probable cause to arrest every well-dressed young African-American man leaving that address just because he's coming out. But what about getting into a car with Pennsylvania plates? Does that narrow the range of possibilities? Well, first, there's nothing about a vehicle mentioned in any of the sources of information. Even if they were independent, they talk about the person being from Philadelphia, but they don't talk about a car. They don't talk about a car with certain plates. Make a model of a car. If the information of the person is coming from Philadelphia and the plates are from Pennsylvania, doesn't that suggest that something might be going on? I think that there is. Certainly, what the trial court found is that there was reasonable suspicion here. There was something here. The question is, is it more than that? So I do think that there are things that the court has pointed to and made findings about that do raise the suspicion that criminal activity may be afoot, but it's not rising to the level of probable cause. When you add all of these things together, even in the totality of circumstances, as she did, she says it was close call, but in her opinion, that it was not enough for probable cause to arrest. The trial court at one point talks about the fact that it might be, and the government pointed it out in the brief, that it might be just as likely that the drugs came from somebody else as it was this person that Ms. Guerin described, and the government took issue with that. I would point out, I believe what the trial court is trying to say, it's just as likely it came from anybody else at that point. Can I ask quickly about the flight? I think the record showed that the law enforcement officers first identified the turn as a surveillance technique, and then after the cars were stopped, one of them turned on the lights, another one shouted, stop police, and I guess held up their badge, even though they were not in uniform. Wouldn't it be reasonable for an officer to think that under those circumstances that Williams was fleeing from police? I think that that is true. I think it's from Mr. Williams' perspective, though, Your Honor. I think that the issue really is... Why is that? Because we're trying to figure out, the court is reviewing whether or not it is appropriate to have probable cause finding here, and the reason why he's fleeing is important to that determination. But it's the officer's probable cause, so it's from a reasonable officer's perspective, I think. Yes, and I think part of what the court is saying, if it's not specifically finding, that this was an ambiguous situation at best, and whether or not you could find that the officers could reasonably believe, given what happened, that he was fleeing is appropriate. Thank you, Your Honors. To follow up on a point that Judge Park just made in answer to Apley's argument, that there were minor things, such as the surveillance detection technique in the flight, I want to remind the Court of the Standard that these mundane situations that are meaningless to your average person on the street  who trained and experienced agents in the course of their investigation. Indeed, here, it was that surveillance technique that caused Agent Pinkham to call Agent Hoffman and say, he's doing a surveillance technique, what do you want us to do? You mean the turning around at the back of the... Because I do that often, I never thought of it as a sort of surveillance technique. Yeah, that's just when I don't make the U-turn. When I go to the movies, I see it, it's more like a power slide, you know, and you hit the brake and the accelerator at the same time. More dramatic than just a three-point turn. And I'm hoping at that time you're not being surveilled by DEA agents, Your Honor. Right. But in this instance, when he was coming to the end of E Street, he could have turned left to go to apartments, he could have turned right to go behind the beverage depot, but instead he flipped around quickly to see if someone was following him, at least from the perspective of the agents. Can you help me? I have a sort of, as I read the record, I read it several times, I have this sense that this is a kind of improvisational afternoon, right? Which doesn't mean there's not probable cause, but it means that Hoffman's in charge, he's already left, the others form a kind of parade of Jeeps, I think, and follow this guy. With this improvisation, there's running, somebody has his gun out, I think, somebody gets hurt, with all that in mind, do you think that affects the way in which the agents might recall their mental processes and kind of retrofit the story, remember it differently because this wasn't planned? I don't believe so, Your Honor, because that's often the case for reactive drug investigations. The reason that Agent Hoffman was not with the rest of the group is because he was still interviewing Danielle Guerin at that time, and the reason why perhaps there wasn't a more fulsome description is because the defendant emerged from 111 Weaver Street while that investigation, while that interview was still going on, so everything was happening in real time. That's why Agent Pinkham remembers a more detailed description than what the defendant appellant argues before us to include description of the items of clothing being worn. So I don't think it's unusual for them to be in that circumstance. Thank you, Your Honors. Thank you. Thank you both for your arguments. The court will reserve decision. The final cases on the calendar are on submission. The clerk will adjourn court.